UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED INC., DIOMED HOLDINGS INC. and DIOMED LIMITED,<br><br>                Plaintiffs,<br>v.<br><br>VASCULAR SOLUTIONS, INC. and NANCY L. ARNOLD,<br><br>                Defendants. | Civil Action No. 03 CV 12498RWZ<br><br>**SECOND DECLARATION OF NANCY ARNOLD** |

I, Nancy Arnold, declare as follows:

1. As I stated in my previous declaration, I am the Senior Director of Marketing and Business Development for Vascular Solutions, Inc. ("VSI") and a defendant in this case. I offer this Second Declaration in connection with Defendants' Motion to Dismiss.

2. I have read Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss or Transfer Venue ("Memorandum") and the attached affidavits, and I feel it necessary to provide the facts omitted from Memorandum that give context to Plaintiffs' allegations and to correct some of Plaintiffs' allegations.

3. First, it should be clear that Diomed, Inc. ("Diomed") contacted Laser Peripherals, LLC. ("Laser Peripherals") about purchasing Laser Peripherals. Diomed believed that it could reduce the cost of laser fibers, a key component of their laser therapy kits, if they owned a producer of laser fibers such as Laser Peripherals.

4. It should also be clear that my actions following Diomed's offer to purchase Laser Peripherals were for the purpose of assisting Diomed in closing its acquisition of Laser Peripherals. I know both Scott Sundet and Peter Klein attempt to estimate the amount of contact I had with Diomed during this time period, and although I can't specifically recall the number of emails I sent or phone calls I placed, I do know that they were on behalf of Laser Peripherals and for the benefit of Diomed's proposed acquisition.

5. Diomed placed several conditions on the acquisition. One of the primary conditions was that key employees, a total of four individuals, including myself, stay on with Laser Peripherals after it had been incorporated into FibersDirect to operate the company. Like many companies venturing into an unfamiliar industry, Diomed wanted to ensure that the old company (Laser Peripherals) continued to run smoothly as merged into the new company (FibersDirect). As President of Laser Peripherals, it was part of my duties to negotiate the employment agreements of these key individuals with Diomed. These agreements were never finalized, and negotiations were ultimately terminated.

6. Another condition of Diomed's attempted acquisition of Laser Peripherals was that an accounting firm would audit Laser Peripherals' finances. Initially, Diomed demanded that Laser Peripherals pay for the audit. Laser Peripherals believed that because Diomed was interested in acquiring Laser Peripherals, Diomed should pay for the audit. Scott Sundet, Laser Peripherals' Chief Executive Officer, ultimately agreed to split the costs of the audit, but Diomed requested Laser Peripherals use their accounting firm BDO Seidman in Boston, Massachusetts. I was unfamiliar with BDO Seidman, but because Diomed wanted to use them, Scott Sundet agreed to the request and instructed

me to sign the engagement letter. I had very little personal contact with the BDO Seidman, who conducted most of the audit through their Minnesota affiliate.

7.     Plaintiffs have placed considerable significance on my involvement in a business plan for FibersDirect, the company Laser Peripherals was to be merged into. Attached to the Affidavit of Peter Klein ("Klein Aff.") as Ex. D. Peter Klein asked me to draft that business plan so that the decision makers at Diomed could assess the potential profitability of Laser Peripherals merging with FibersDirect. While the scope of the business plan was broad, it did not consider the potential manufacturing or marketing of marked sheaths nor did it assess the profitability of an Improved EVLT kit. Indeed, I don't ever recall learning anything about either the Improved EVLT kit or a marked sheath.

8.     I am surprised that Plaintiffs believe I learned of the Improved EVLT kit or marked sheath during the preparation of the FibersDirect business plan. As I think is clear from the text of the final business plan, the focus of the business plan was to assess the profitability of merger Laser Peripherals laser fiber business with FibersDirect. Laser Peripherals did not produce anything other than laser fiber and some related accessories, and there were no plans for FibersDirect to manufacturer or distribute marked sheaths. See Business Plan, Klein Aff. Ex. D at DIO0060.

9.     Finally, I must address two other points that, while not central to the claims against me, are completely inaccurate. First, I did not have contacts with Diomed in Massachusetts for "four years" prior to Diomed's attempted acquisition of Laser Peripherals as Scott Sundet claims. Diomed did not open its Massachusetts office until just before Diomed attempted to acquire Laser Peripherals. Nearly all of my prior

3

contacts with Diomed, therefore, were with its office in the United Kingdom. Second, I did not delete my files from my computer before I left Laser Peripherals. I left my computer on my desk the day I left Laser Peripherals with all of my files still on the computer. I understand from discussions with the former office manager of Laser Peripherals, who now works at VSI, that Scott Sundet took my computer for his own use shortly after I left. I also understand that the computer was later transferred to an employee of Clarus Medical, another company Scott Sundet owns. If data was deleted from my computer, it was deleted by someone after I left.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of April, 2004.

/s/ Nancy Arnold
Nancy Arnold