IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC., DIOMED HOLDINGS, INC., AND DIOMED LIMITED,<br><br>    Plaintiff,<br><br>v.<br><br>VASCULAR SOLUTIONS, INC. AND NANCY L. ARNOLD,<br><br>    Defendant. | CIVIL ACTION NO. 03-CV-12498 RWZ |

**DIOMED'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Diomed, Inc., Diomed Holdings, Inc., and Diomed Limited (collectively "Diomed") file this memorandum in opposition to the Motion for Summary Judgment filed by Defendants Vascular Solutions, Inc. ("VSI") and Nancy L. Arnold. Accompanying this memorandum is Diomed's Statement of Facts pursuant to Local Rule 56.1, the Declaration of Ilan N. Barzilay, the Declaration of Ryan McManus, the Declaration of Michael Thomas, and the Declaration of Steven Elias, MD. For the reasons below, Defendants' motion for summary judgment should be denied.

**BACKGROUND**

Diomed leads the industry in providing lasers and peripheral equipment to be used in the treatment of varicose veins. (Diomed's Local Rule 56.1 Statement of Facts As To Which There Is A Genuine Issue ("Facts") ¶ 4). The procedure for treating varicose veins with laser energy to the vein is commonly called "laser vein treatment" or "laser vein ablation." (Facts ¶ 107).

907891.1

In the laser treatment procedure, a laser is connected to an optical fiber and the fiber is inserted, through a sheath, into a vessel (typically the greater saphenous vein) of a patient. The physician then fires the laser, while gradually withdrawing the sheath and fiber from the vein. The laser energy ultimately causes the vein to shrink or collapse, redirecting blood flow from the superficial vein to the deep vein system and treating the patient's varicose veins. (Facts ¶ 2).

In 2001, Laser Peripherals, Inc. ("LPI"), a third party, began a relationship with Diomed as a supplier under which it assumed a continuing obligation to maintain Diomed's trade secrets. An agreement was signed in 2001 by Defendant Arnold, LPI's President, and by Diomed's Chief Executive Officer, Peter Klein, that included a confidentiality clause. (Facts ¶¶ 10, 19). (Id.). Under that agreement, LPI provided Diomed with optical fibers to be used in the above procedure. (Facts ¶ 10).

In 2002, Diomed negotiated to acquire LPI. (Facts ¶ 10). As part of those negotiations, LPI signed an additional non-disclosure agreement (referred to by VSI as the "NDA") on April 2, 2002. (Facts ¶¶ 13, 31). A letter of intent between the parties also confirmed Diomed's confidentiality requirements. (Facts ¶ 65(f)).

During the acquisition negotiations, but after the April 2 NDA, Klein had discussions with Arnold in which Klein disclosed to her certain confidential information. Before making the disclosure, Klein specifically informed Arnold that the information that he was about to disclose was confidential and that he expected her to maintain the confidentiality of that information. (Facts ¶¶ 42, 46, 47). To allow that disclosure, Arnold agreed to keep it confidential. (Id.).[1] The information included Diomed's marketing plan for its improved EVLT® Kit, Diomed's marketing and strategy plans, and Diomed's idea of marking the sheath so that physicians could

more precisely judge the rate of pull back that would result in the most medically effective treatment.  (Facts ¶¶ 42-43).

The merger between Diomed and LPI was not consummated.  Arnold then left LPI in September 2002 to join VSI.  (Facts ¶¶ 15).  When Arnold joined VSI, she was the most knowledgeable person at VSI about varicose vein treatment.  (Facts ¶¶ 5, 65(a)).  Within a week of joining, Arnold began work on creating a varicose vein treatment product for VSI.  (Id.).  She contacted a number of vendors who had supplied materials to Diomed.  (Facts ¶ 65(c)).  Arnold was eventually made VSI's Director of Vari-Lase Business.  (Facts ¶ 65(b)).

VSI's first varicose vein product contained a marked sheath that had been a Diomed trade secret, and that Klein had disclosed to Arnold in confidence.  (Facts ¶ 141).

In addition to using a marked sheath, VSI also advertised its products in its July 2003 "Reimbursement Newsletter" using the trademark "ELT," a mark confusingly similar to (and thus an infringement of) Diomed's EVLT® trademark.  (Facts ¶ 73(a)).  Diomed had adopted the trademark EVLT® for use with selling these materials and has registered EVLT® with the United States Patent and Trademark Office.  (Facts ¶ 68).  The Trademark Examiner conducted a search, considered the nature of the mark and its usage, and considered the mark to be registrable on the Principal Register.

VSI's newsletter was distributed to doctors and insurance companies.  (Facts ¶ 73(a)).  Although VSI markets its products under the name "Vari-Lase," it has also repeatedly referred to its product and services using the marks "ELT," and "EVLT" (Facts ¶¶ 73(a)-(c)), sometimes referring to its kit as an "EVLT kit."  (Facts ¶ 73(b)).

---

[1] VSI conceded, for purposes of this motion, the truth of Klein's testimony of this conversation and the existence of the separate agreement of confidentiality.

VSI also disseminated what it called an "Assurance of Compatibility" to doctors who perform laser ablation procedures. (Facts ¶ 127). This document falsely implied that Diomed's warranty procedures violate the United States warranty and anti-trust laws.

The actions of VSI and Arnold resulted in Diomed's filing the instant action. VSI has moved for summary judgment on each of Diomed's counts and on VSI's counterclaim that Diomed's EVLT® mark is a generic term for laser ablation of the saphenous vein. At a minimum, multiple questions of material fact remain in this case. In opposition to this motion, Diomed has presented more than sufficient evidence entitling it to prove its case to a jury. For the reasons discussed below, Defendants' motion for summary judgment should be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if the record "construed in the light most favorable to the party opposing summary judgment," reveals no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 261 (1986); Fed. R. Civ. P. 56(c). The ultimate burden of persuasion remains on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). This burden is a "stringent one." Id. at 331 n. 2 (citations omitted). "Summary judgment should not be granted unless it is clear that a trial is unnecessary, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party." Id. Furthermore, "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1140 (9th Cir. 2002).

As shown below, genuine questions of material fact exist and substantial evidence shows that Defendants have engaged in wrongdoing as alleged in the Complaint. Among the major disputed questions of material fact are:

- Whether Klein disclosed the idea of using a marked sheath in laser vein treatment to Arnold.
- Whether, prior to that disclosure, Arnold orally agreed to hold that disclosure in confidence.
- To what extent Arnold used Diomed's confidential information while at VSI.
- Whether VSI improperly used Diomed's EVLT® trademark.
- Whether VSI's website infringes the trade dress in Diomed's website.
- Whether the statements in VSI's "Assurance of Compatibility" are true.
- The extent to which Diomed was damaged by the actions of VSI and Arnold.

Because each of these disputes is material to an asserted cause of action, this case cannot be decided on summary judgment.

## ARGUMENT

### I. THE COURT SHOULD DENY SUMMARY JUDGMENT ON THE TRADE SECRET, BREACH OF CONTRACT, AND TORTIOUS INTERFERENCE COUNTS

VSI's motion for summary judgment concentrated on the April 2, 2002 Non-Disclosure Agreement (the "2002 Agreement") between Diomed and Laser Peripherals. VSI argued that that agreement required written confirmation of oral disclosure of confidential materials, and here no written confirmation was sent. That no written confirmation was sent pursuant to the 2002 Agreement, however, does not entitle Defendants to summary judgment on the trade secret count. Two other agreements between Diomed and Laser Peripherals/Arnold required Arnold to maintain Diomed's information in confidence. The first of those agreements was the 2001

Agreement between Diomed and Laser Peripherals. The 2001 Agreement was in effect when Arnold and Klein engaged in discussion and thus governed those discussions. (Facts ¶¶ 19, 31).

In addition, prior to those discussions, Arnold had orally agreed with Klein to keep the matters to be disclosed confidential. (Facts ¶¶ 42, 46, 47). This agreement was not conditioned on written confirmation of oral disclosures. (Facts ¶ 46). The existence of this third confidentiality agreement, and the exchange of confidential information under it, are conceded by Defendants for the purposes of this motion.

The exchange of this information from Diomed was prompted by Arnold's concerns as to whether Diomed, as the future owner of Arnold's company, and her future boss, would be adequately positioned to perform well in the intended business venture. (Facts ¶¶ 39, 42, 47). Indeed, among the terms of Diomed's purchase of Laser Peripherals was that the owners of Laser Peripherals (including Arnold) would receive Diomed's stock in compensation for Diomed's purchase. (Facts ¶ 39). Furthermore, Arnold would remain president of the acquired entity and would run its day to day operations. (Id.). She thus had an interest in hearing Diomed's highly confidential product development and financial data.

Arnold raised her concerns about the future of the proposed entity as well as the future of Diomed with Klein. (Id.). During this discussion, Klein disclosed to Arnold the steps Diomed was taking to ensure its position as a market leader in the area of varicose vein treatment. (Facts ¶¶ 39, 42, 44). To convince Arnold that Diomed was taking steps to ensure the success of both Diomed and the future entity, Klein disclosed to Arnold, in confidence, Diomed's marketing plan for its improved EVLT® Kit, Diomed's marketing and strategy plans, and specifically Diomed's highly confidential new business idea of marking the sheath so that physicians could more precisely judge the rate of pull back. (Facts ¶¶ 42, 44). This concept of using a marked sheath

6

with laser vein treatment has since been deemed by the U.S. Patent Office to be sufficiently original to warrant patent protection. (Facts ¶ 57).

This conversation was subject to the 2001 Agreement, the 2002 Agreement, as well as the oral agreement between Klein and Arnold, entered into just before, and as a condition of, Klein's disclosing the information. Properly viewed in the light most favorable to Diomed, as required by the summary judgment standard, Defendants are not entitled to summary judgment on the trade secret counts, as explained below.

### A.  Diomed Possessed Valid Trade Secrets During the Laser Peripherals Meeting

To demonstrate misappropriation of trade secrets under Massachusetts law, Diomed must prove: (1) the information in question is a trade secret, (2) Diomed took reasonable steps to preserve the secrecy of that information, and (3) the Defendants used improper means, in breach of a confidential relationship, to acquire and use the trade secret. DB Riley, Inc. v. AB Engineering Corp., 977 F.Supp. 84, 90 (D. Mass. 1997). "A trade secret may consist of any…information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 975 F.Supp. 30, 33 (D. Mass. 1997); cf. Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 899 (Minn. 1983) (to be a trade secret (1) the information must not be generally known or readily ascertainable, (2) the information must derive independent economic value from secrecy, and (3) the party asserting the misappropriation must have made reasonable efforts to maintain secrecy of the item.).[2]

---

[2] The Defendants argue that Minnesota law governs Diomed's claim of trade secret misappropriation. Although the 2002 Agreement contains a clause choosing Minnesota law, the 2001 Agreement and oral agreements do not. Furthermore, the disclosures were made by a

7

Defendants attack the trade secret status of Diomed's idea of using a marked sheath with laser vein treatment as being nothing more than a "ruler."

Characterization of the marked sheath as a "ruler" is misleading and incorrect. The marked sheath's gradations, unlike a ruler, have no numbers and are not used, as suggested by VSI, for measuring distance. (Facts ¶ 50, 51). The purpose of the markings on the sheath is to give doctors an effective method for measuring the rate of pull back of the sheath, thereby ensuring even distribution of laser energy to the treatment area. (Id.). Although physicians recommended a steady pull back rate, prior to Diomed's development of a marked sheath for this purpose there was no known solution or product that would ensure steadiness. (Facts ¶ 53).[3]

In its papers VSI misquotes Diomed's head of research and development. The witness, Mike Irvine, is cited by VSI for the proposition that Diomed's marked sheath idea was obvious. In fact the witness said no such thing. When Mr. Irvine stated that it is "obvious that a ruler can be used in this situation" he was responding to the question of VSI counsel which asked if it was obvious to use a ruler where a child wishes to measure a simple distance. (Facts ¶ 52).

Indeed, VSI had no evidence that using a marked sheath with laser vein technology was known by anyone outside of Diomed at the time Klein made the disclosures to Arnold. (Facts ¶ 6). Instead, VSI cited knowledge of the problem of pull back rate and the existence of markings on other medical devices and jumped to the conclusion that using a marked sheath with laser vein technology was generally known. This was improper.

> The fact that a process is the combination and adaptation of old principles to new purposes does not prevent the process from being a trade secret if the process as distilled accomplishes a result which gives the holder a competitive advantage due to his own ingenuity, research and development.

---

Massachusetts corporation, the trade secrets in question were the property of a Massachusetts corporation, and the breach harmed a Massachusetts corporation.

Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 169 (Mass. 1979).[4]

VSI also attacks the marked sheath idea as being too "simple." This also is insufficient grounds to negate a trade secret. Id. ("[T]he fact that the secret was easy to duplicate does not militate against it being a trade secret."). Defendants rely on Electro-Craft for their simplicity argument. This reliance is misplaced, as Electro-Craft found that the secret in question was not too simple to be protected and held that "[n]ovelty is not a requirement for trade secrets to the same extent as for patentability." Electro-Craft, 332 N.W.2d at 899; see also TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F.Supp.2d 23, 29 (D. Mass. 2004) ("A trade secret need not have the novelty that is requisite for a patent, it must only confer a competitive advantage on its possessor."). In fact, Diomed's trade secret exceeds this standard as the idea of using a marked sheath with laser vein treatment has been determined by the USPTO to be sufficiently new and non-obvious as to be deserving of patent protection. (Facts ¶ 57). A notice of allowance of a patent to this technology has already issued and the patent itself will issue shortly. (Id.). Diomed's idea was thus more than sufficient to qualify for trade secret protection.

Diomed took reasonable steps to protect this trade secret. The secret was known only to four or five Diomed employees and all were subject to confidentiality restrictions. (Facts ¶¶ 61, 63). When the marked sheath was discussed with Diomed's Board of Directors (who were also subject to confidentiality restrictions) they were reminded that such ideas were confidential. (Facts ¶ 61). Even the sales force was not informed of the development of a marked sheath for laser vein treatment until the product was ready to go to market. (Facts ¶ 63). These precautions are sufficient to protect Diomed's trade secrets. USM Corp. v. Marson Fastener Corp., 379

---

[4] The competitive advantage lost by Diomed when VSI was first to market with the marked sheath is discussed in section V below.

Mass. 90, 101 (1979) (finding that courts "do not require the possessor of a trade secret to take heroic measures to preserve its secrecy").

### B.    Arnold Agreed Not to Disclose Diomed's Trade Secrets

VSI argues that the clause of the 2002 Agreement which required written confirmation of oral disclosures precludes a finding of misappropriation.  First, even if a trade secret holder does not confirm its trade secrets in writing pursuant to a clause of an agreement it still may be entitled to relief for misappropriation of those trade secrets.  TouchPoint, 345 F.Supp.2d at 29-31 (D. Mass. 2004) (entering a preliminary injunction for trade secret holder despite agreement covering "only information that was labeled in writing as being confidential" and "exchange of information [that] took place without the appropriate labeling.").  See also Knapp Schenck & Co. Insurance Agency, Inc. v. Lancer Management Co., Inc., 2004 WL 57086 at * 8 (D. Mass. 2004) (denying summary judgment on a misappropriation claim, specifically holding that "a jury could find that an implied confidential relationship arose between [the parties]."); Mankato Implement, Inc. v. J.I. Case Co., 1991 U.S. Dist. LEXIS 20082 at *9 (D. Minn. 1991) (holding, on similar facts to the instant case, where "Plaintiff has presented evidence [of subsequent oral confidentiality agreement] from which a reasonable jury could find that the parties subsequently modified their written agreement, summary judgment should be denied"); see also Den-Tal-Ez v. Siemens Capital Corp., 1988 Pa. Super. LEXIS 3184, 9 U.S.P.Q.2d 1932 (Pa. Super. 1988) (where contract required written confirmation of trade secrets, finding trade secret misappropriation could exist even in absence of such written confirmation).

Second, Klein's disclosures to Arnold were subject to three separate agreements to maintain their confidentiality:  the 2001 Agreement, the 2002 Agreement, and the oral agreement

made between Klein and Arnold just prior to the disclosure. (Facts ¶¶ 10, 13, 19, 31, 46, 47). The existence of the last of these agreements is conceded for purposes of this motion. This third agreement had no "written confirmation" requirement. (Facts ¶ 46). As such, summary judgment is inappropriate.

### C.     Diomed Disclosed Trade Secrets to Arnold

VSI has also conceded, for purposes of this motion, that Klein disclosed to Arnold the idea of using a marked sheath with laser vein treatment. (Facts ¶ 42).

### D.     Arnold's Breach of Confidentiality Agreement and Use of Trade Secrets by VSI

Even without the benefit of the factual presumptions provided by Diomed's status as the non-movant for this motion for summary judgment, Diomed has sufficient evidence to show that Arnold and VSI misappropriated Diomed's confidential information.

Prior to her business dealings with Diomed, Arnold had never discussed the varicose vein market with anyone. (Facts ¶ 65(a)). When Arnold joined VSI she was the only one there who knew about the varicose vein market. (Facts ¶ 5). Within her first week at VSI, Arnold was working on a varicose vein product. (Facts ¶ 6, 65(a)). Arnold was responsible for all aspects of development of VSI's varicose vein product including finding and negotiating agreements with vendors. (Facts ¶¶ 65(b)-(c)). VSI eventually purchased sheaths and needles from the same suppliers as Diomed. (Facts ¶ 65(c)). At least one of those suppliers was discussed with Arnold in the context of the confidential negotiations between Laser Peripherals and Diomed. (Id.). Arnold negotiated the agreements with these suppliers for VSI. (Id.). Arnold hired Diomed's National Sales Manager to work for VSI. (Facts ¶ 65(d)). VSI's varicose vein product was

11

developed in a far more efficient manner than VSI's other products (Facts ¶ 65(e)), evidently as a result of use of Diomed's confidential information. Finally, information confidential to Diomed was found in the possession of VSI. (Facts ¶ 65(f)).

These facts taken together are sufficient for a reasonable fact finder to conclude that Arnold and VSI misappropriated Diomed's trade secret information and breached the agreements with Diomed. See Knapp, 2004 WL 57086 at *5 (D. Mass. 2004) ("While Lancer may be correct that Knapp Schenck has failed to provide evidence of a smoking gun which directly demonstrates that Lancer used Knapp Schenck information, its argument falls short of establishing sufficient grounds for summary judgment because Knapp Schenck has nevertheless provided enough evidence to put the use issue in dispute.").

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE TRADEMARK CLAIMS OR ON THE COUNTERCLAIM OF TRADEMARK INVALIDITY

### A. Diomed's Federally Registered EVLT® Mark Is A Valid, Non-Generic Trademark

Diomed has been using the trademark EVLT® in conjunction with medical laser beam delivery systems since March 2001. (Facts ¶ 68). It has also obtained a federal registration for this mark, after due consideration by a Trademark Examiner at the USPTO. This registration entitles Diomed to a presumption that its trademark is valid. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000). As established by the unrebutted testimony[5] of a practitioner in the field of laser vein treatment, EVLT® is understood to be a Diomed trademark.

---

[5] VSI offered no affidavits on the genericness issue from any practitioners in the field. If they purport to do so hereafter, not only will their submission be too late, but more to the point it would only create a disputed issue of material fact.

(Facts ¶ 107), and EVLT® is not a generic term for treating varicose veins with laser energy. Generic terms for this procedure are "laser vein treatment" or "laser vein ablation." (Id.).

As an initial matter, "[w]hether a term is generic, descriptive, or inherently distinctive is a question of fact." See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993). To show genericness, Defendants must show that it is publicly understood that the mark in question, EVLT®, refers primarily to the relevant group of goods and services. See H. Marvin Ginn Corp. v. International Ass'n of Fire Chiefs, 782 F.2d 987, 990 (Fed. Cir. 1986) ("Ginn"). In order to do that, the "genus of the goods or services at issue" must first be determined. Id. The standard by which Defendants' evidence should be judged is the purchaser-understanding test, codified in the Trademark Clarification Act of 1984, which requires a showing that the purchasing public regards the mark as generic. Gilson on Trademarks ("Gilson") § 2.02[1] (citing 15 U.S.C. §§ 1064(3), 1127).

Defendants have produced no evidence showing that the relevant consumer base regards EVLT® as generic, and have failed even to define what the relevant consumer base is, confining itself to discussing a handful of uses downloaded from the Internet. Even if Defendants could show (which they have not and cannot) that some consumers perceive EVLT® as being a common name for a product or service, that still would not suffice. Defendants must prove that the majority of the purchasing public perceives EVLT® as representing an entire class of laser vein treatment products, rather than just Diomed's products and services. Gilson § 2.02[1] (citing A.J. Canfield Co. v. Honickman, 808 F.2d 291, 1 U.S.P.Q.2d. 1364 (3d Cir. 1986); Helene Curtis Indus., Inc. v. Church & Dwight Co., 560 F.2d 1325, 195 U.S.P.Q. 218 (7th Cir. 1977)). Some courts, in fact, require conclusive proof of genericness, whereby Defendants must prove that, to the relevant public, the mark has absolutely no trademark distinctiveness. Gilson

§ 2.02[1] (citing Marks v. Polaroid Corp., 129 F.Supp. 243, 105 U.S.P.Q. 10 (D. Mass. 1955), aff'd, 237 F.2d 428, 111 U.S.P.Q. 60 (1st Cir. 1956)).

Here Defendants fail to identify the genus of the goods and services at issue and similarly fail to show that the majority of the purchasing public perceives EVLT® to be a generic descriptor. Indeed Defendants offer none of the typical forms of evidence used to prove genericness, such as expert testimony, survey evidence, or testimony from persons in the trade. Indeed, the only testimony from persons in the trade supports Diomed's position that EVLT® is recognized as a trademark and is not generic. (Facts ¶ 107). Even VSI's own witnesses admit that "there is not one acronym" to refer to the procedure and that VSI "never used EVLT" as a term for the procedure. (Facts ¶ 107). Diomed has also provided extensive examples of industry recognition of the EVLT® trademark. (Facts ¶ 107). Proving a mark—particularly a federally registered mark—generic is a difficult burden to meet. Defendants have not even come close.. Defendants' motion for summary judgment on their counterclaim of genericness should be denied.

### B. VSI Has Infringed the EVLT® Trademark

VSI argues that there is no likelihood of confusion between its use of "ELT" and "EVLT" and Diomed's trademark. Likelihood of confusion, like genericness, is a question of fact. Equine Tech., Inc. v. Equitechnology, Inc., 68 F.3d 542, 546 (1st Cir. 1995). "Due to the factual nature of likelihood of confusion, determining whether a likelihood of confusion exists at the summary judgment stage is generally disfavored because a full record is usually required to fully assess the facts." KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 608 (9th Cir. 2005).

In evaluating likelihood of confusion, the First Circuit typically examines (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the Defendant's intent in adopting its mark; and (8) the strength of the Plaintiff's mark. I.P. Lund Trading, ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998). These factors are analyzed in order below.

### 1. VSI Used Marks Identical and Similar to EVLT®

As alleged in the Complaint and supported by the record cited in Diomed's Statement of Facts, VSI used the term "ELT" in its marketing materials distributed to potential customers, even though VSI recognized that EVLT® was a Diomed trademark. (Facts ¶ 73(a), (c)). VSI not only used ELT in its public materials, it also used ELT in individual communications with third parties when discussing its products. (Facts ¶ 73(c)). ELT differs from Diomed's trademark by only one letter. See Nupro Co. v. Nypro, Inc., 1983 WL 238, 221 U.S.P.Q. 693 (D. Mass. 1983) (granting summary judgment to trademark Plaintiff based on use of term only one letter removed from Plaintiff's mark).

VSI has also used the precise term "EVLT" in marketing its products and services. The evidence shows that VSI has gone so far as to refer to its products as "EVLT kits." (Facts ¶ 73(b)). This use is identical to Diomed's EVLT® mark and is infringing.

### 2. VSI's Goods Are Similar To Diomed's

Both Diomed and VSI sell kits to be used with laser vein treatments. (Complaint ¶¶ 10, 43-45). This fact is undisputed.

3. <u>VSI's Channels of Trade, Advertising, and Class of Prospective Purchasers Are the Same As Diomed's</u>

Often analyzed together (see <u>Equine</u>, 68 F.3d at 546), these factors also weigh heavily in favor of a finding of likelihood of confusion. Both Diomed and VSI sell their kits through a direct sales force. (Facts ¶ 40). Doimed and VSI compete head to head. (Facts ¶ 4). Both Diomed and VSI market their kits at the same trade shows. (<u>Id</u>.). Both Diomed and VSI market their kits to the same doctors. (<u>Id</u>.).

4. <u>VSI Intended to Compete With Diomed Directly When Adopting Infringing Marks</u>

Through all of VSI's actions, it is clear that its intent was to "go after" Diomed, both in its general business strategy and in its use of marks which infringe Diomed's EVLT® mark. VSI hired Arnold who had insider information as to Diomed's trade secrets. Then, VSI hired Tony Jakubowski, Diomed's former National Sales Manager, to perform the same duties for VSI that he had performed for Diomed. (Facts ¶ 65(d)). Then, VSI publicly acknowledged Diomed's rights to the EVLT® trademark (Facts ¶ 73(a)) while at the same time co-opting the mark and using it in an infringing manner. (Facts ¶ 73(b)). Then, VSI issued false statements to impugn Diomed's business practices. (Facts ¶¶ 127, 129, 131, 132). VSI intended to take customers from Diomed through any means, including trademark confusion.

5. <u>Strength of Diomed's Trademark</u>

As discussed above, Diomed's EVLT® trademark—used since 2001, and federally registered since 2003—is strong and presumed to be valid. Diomed has spent millions of dollars on promoting its EVLT® product and associated trademark in its product literature, at major national and international trade shows, on its web site, and through various other media.

\* \* \*

16

Viewing all evidence in the light most favorable to Diomed, VSI is not entitled to summary judgment on Diomed's trademark claims.

### C. Diomed's Trade Dress Claim

VSI's website was part of its overall campaign targeting Diomed's business. Its website contains many similarities to Diomed's website including identical colors, typesets, illustrations, and background themes. (Facts ¶ 109). These overlapping features are (1) used in commerce, (2) non-functional, and (3) distinctive, and are therefore protectable by Diomed. I.P. Lund, 163 F.3d at 36. VSI's arguments that the two websites are not likely to be confused are conclusory and insufficient to obtain summary judgment. See e.g. Equine, 68 F.3d at 546 (likelihood of confusion is a question of fact).

### III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON DIOMED'S CLAIMS FOR TRADE LIBEL, INJURIOUS FALSEHOOD, COMMERCIAL DISPARAGEMENT AND DEFAMATION

VSI distributed an "Assurance of Compatibility," which claimed that Diomed's policy of voiding a customer's warranty for using VSI products was in violation of the Sherman and Clayton Anti-Trust Acts. (Facts ¶ 127). This document was written by VSI's CEO, a former attorney. (Id.). The statement that Diomed was in violation of Federal law was false. Indeed, VSI has made no attempt to argue that the statement was true.

This "Assurance of Compatibility" was taken seriously by doctors who believed that Diomed was engaged in illegal activity. (Facts ¶¶ 131-132). VSI used the "Assurance" in combination with instructions to its sales associates to categorize Diomed's actions as a threat to doctors. (Facts ¶ 127).

VSI knew that these statements were false and acted in disregard of their truth. VSI also knew, or should have known, that making these statements would likely result in harm to Diomed. Restatement (Second) of Torts § 623A (1977). The harm to Diomed is further discussed in section V below.

### IV.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON DIOMED'S UNFAIR COMPETITION AND ACCOUNTING CLAIMS

VSI's argument requesting summary judgment on these claims is simply that they are duplicative and that the action does not arise "primarily or substantially" within Massachusetts. VSI's unfair and deceptive trade practices have (1) occurred in Massachusetts (VSI notably does not deny distributing the infringing Reimbursement News or Assurance of Compatibility in Massachusetts) and (2) harmed Diomed, a Massachusetts corporation, located in Andover, Massachusetts. Although determination of "primarily and substantially" is "not a determination that can be reduced to any precise formula," factors to be determined include the "place of conduct and the situs of loss." Auto Shine Car Wash Systems, Inc. v. Nice 'N Clean Car Wash, Inc., 58 Mass.App.Ct. 685, 689 (Mass. App. Ct. 2003). Here VSI does not deny that accused conduct occurred in Massachusetts, and the site of the loss is clearly Diomed, located in Massachusetts. Diomed is entitled to pursue its claim under Mass. Gen. L. ch. 93A.

Diomed is similarly entitled to an accounting of VSI's profits derived from its infringements of Diomed's trademarks. See 35 U.S.C. § 1117. Defendants are not entitled to summary judgment on these counts.

**V.     DIOMED WAS DAMAGED BY VSI'S TORTIOUS ACTIONS**

Approximately 85% of Diomed laser owners who do not purchase their fibers or kits from Diomed purchase them from VSI. (Facts ¶ 141). Between 125 and 175 of Diomed's laser customers are purchasing kits from VSI. (Id.). VSI's selling of a marked sheath is the main reason these customers purchase from VSI. (Id.). At least one specific customer identified VSI's sales of a marked sheath prior to Diomed as the reason it ceased purchasing its kits from Diomed. (Id.). VSI's stock price also benefited from its sales of a kit with a marked sheath. (Facts ¶ 142).

As a result of VSI's sales of a marked sheath, Diomed was forced to lower its kit prices. (Facts ¶ 142). Diomed's reputation as a market leader and innovator was damaged by VSI's arrival on the market with a marked sheath kit prior to Diomed. (Facts ¶ 143). Diomed was also harmed by VSI's assertions that Diomed was engaged in illegal activity. (Facts ¶ 132). Diomed is entitled to monetary damages for its losses due to lost sales, price erosion and damage to its reputation. (Facts ¶¶ 141-143). Diomed is further entitled to VSI's profits from trading off Diomed's EVLT® trademark, 35 U.S.C. § 1117, and an injunction preventing VSI from using infringing marks including "ELT" and EVLT."

**CONCLUSION**

Viewed in the light most favorable to Diomed, it is clear that substantial questions of fact remain on Diomed's counts against VSI and Arnold. Defendants' request for summary judgment should be denied.

Respectfully submitted,

DIOMED INC., DIOMED HOLDINGS INC., and DIOMED LIMITED,

By their counsel,

Dated: June 28, 2005

/s/ Michael Albert
Michael A. Albert (BBO #558566)
malbert@wolfgreenfield.com
James J. Foster (BBO #553285)
jfoster@wolfgreenfield.com
Michael N. Rader (BBO #646990)
mrader@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
Tel: (617) 720-3500
Fax: (617) 720-2441