UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12498-RWZ

DIOMED, INC., DIOMED HOLDINGS, INC., and
DIOMED LIMITED

v.

VASCULAR SOLUTIONS, INC., and
NANCY ARNOLD

MEMORANDUM OF DECISION AND ORDER

January 31, 2006

ZOBEL, D.J.

   Plaintiffs Diomed, Inc., Diomed Holdings, Inc., and Diomed Limited (collectively, "Diomed") filed a twelve-count complaint against defendants Vascular Solutions, Inc. ("VSI") and Nancy Arnold ("Arnold"), alleging various trade secret, trademark infringement, unfair competition, contract and tort claims.  Defendants filed a one-count counterclaim, alleging trademark invalidity, and thereafter moved for summary judgment on all counts.  At the hearing on the motion, Diomed agreed to dismiss voluntarily the trademark infringement claims, all of the claims based on VSI's "Assurance of Compatibility," and that portion of the unfair competition and trade claims arising out of either trademark infringement or the Assurance of Compatibility.  (Summ. J. Hearing Tr., at 31).[1]  Before me is defendants' summary judgment motion as to the remaining counts, which are: trade secret misappropriation (Count I), tortious

---

   [1]However, VSI has not abandoned its counterclaim.  (Defs.' 7/18/05 Letter).

interference with contract (Count VIII), breach of the nondisclosure agreement (Count IX), unfair competition (Count X), accounting (Count XI), and unfair trade practices (Count XII).

I.  Background

In January 2002, Diomed introduced the "EVLT System," a non-surgical laser treatment for varicose veins.  Almost immediately, Diomed began developing an improved EVLT System, which it planned to introduce in the second half of 2003.  The primary change was the addition of "interval markings" to the sheath component, which would give the practitioner "enhanced precision and control."  (Compl. ¶ 18).

In early 2002, Diomed entered into acquisition discussions with one of its suppliers, Laser Peripherals ("LP"), whose president was Arnold.  On April 2, 2002, Diomed and LP entered into a Non-Disclosure Agreement ("NDA"), which prohibited the parties from disclosing confidential information received through due diligence.  The NDA provided that:

> To be protected by this Agreement, Confidential Information must be marked (or confirmed in writing within 3 business days in the case of verbal disclosures or facility visits as required herein) as such by each party at the time of its disclosure or delivery to the other party or within 10 business days thereafter.

(Barzilay Decl. Ex. 11, ¶ 1).  With regard to oral disclosures, the NDA further specified:

> In connection with an exchange of "oral" information or information obtained while "visiting a party's facilities", such information shall only be "Confidential Information" if the party seeking confidentiality provides in writing within 3 business days of the oral communication or the facility visit, a summary of the those [sic] comments or subjects or physical items that are considered confidential by that party.

(Id. at 1).

Sometime in April or May 2002, during the due diligence phase, Arnold had a conversation with Peter Klein ("Klein"), then-CEO of Diomed. Before telling Arnold about Diomed's future plans for the EVLT System, plaintiffs allege that "Klein told Arnold that the information he was about to reveal to her was confidential and subject to the Diomed-LP NDA." Plaintiffs further allege that "Arnold acknowledged Klein's statement by confirming her agreement to keep the disclosed information confidential." (Compl. ¶ 30). Klein then proceeded to tell Arnold about the marked sheath design as well as Diomed's marketing strategy for its improved System.

Diomed and LP signed a letter of intent on April 30, 2002, which incorporated the terms of the NDA (Barzilay Decl. Ex. 16, at 3-4), but the proposed acquisition never materialized. In September 2002, Arnold left LP and joined VSI. Until that time, VSI's primary business was vascular sealing devices; it had not yet entered the market for laser-based varicose vein treatment products. (Compl. ¶ 41; Answer ¶ 41). In July 2003, before Diomed launched its improved EVLT System, VSI launched Vari-Lase, a similar varicose vein treatment product. Six months later, Diomed filed this action.

II.  <u>Breach of the NDA (Count IX) and Tortious Interference with Contract (Count VIII)</u>

Two counts—breach of the NDA (Count IX) and tortious interference with contract (Count VIII)—arise from Diomed's claim that Arnold breached the terms of the NDA by revealing to VSI confidential information that she learned during her conversation with Klein. As a consequence, VSI is said to have tortiously interfered with the NDA. In their summary judgment motion, defendants argue that (1) the NDA

protected only information that was marked confidential or confirmed in writing as confidential, (2) Klein's alleged oral disclosure was never thus designated confidential, and (3) therefore, Arnold could not have breached the NDA by telling VSI about what she learned in her conversation with Klein.  Diomed does not dispute that it never confirmed in writing the confidential nature of Klein's disclosure.  Instead, it argues that even if the oral disclosures from Klein to Arnold were not "confidential" within the meaning of the NDA, their conversation was nevertheless confidential under two other agreements between Diomed and LP: an April 2001 agreement between the two parties, and the alleged oral assurance that Arnold gave to Klein before he revealed Diomed's plans.  For several reasons, Diomed's argument is unavailing.

      A.      The April 2001 Agreement

With respect to the 2001 agreement (which the parties entered when LP began supplying laser fibers to Diomed), breach of that agreement was never alleged in Diomed's complaint.  In essence, Diomed impermissibly seeks to amend its complaint without ever filing a motion for leave to amend pursuant to Fed. R. Civ. P. 15.  Cf. E&E Inv., Inc. v. Simmons Co., 169 F.R.D. 467, 468 (D.P.R. 1996).  Diomed cannot allege breach of one agreement in its complaint and raise breach of an entirely different agreement when it confronts difficulty in proving its original allegation.  Cf. Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992).  Nor is this a case where Fed. R. Civ. P. 8 would require a broad reading of the complaint.  The April 2001 agreement is mentioned nowhere in the complaint and is raised for the first time in Diomed's opposition to defendants' summary judgment motion; in the

absence of any "essential allegations" that might form the basis of a claim based on the 2001 agreement, broad construction of the complaint is unwarranted. See NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 34-35 (1st Cir. 1994).

Moreover, even if Diomed had pled breach of the April 2001 agreement by Arnold, that claim would still fail. The April 2001 agreement—like the NDA—required that confidential information disclosed orally be "confirmed in writing within 30 days after such disclosure." (Barzilay Decl. Ex. 10, ¶ 1). The absence of any written confirmation following Klein's conversation with Arnold would thus also condemn a claim of breach under the April 2001 agreement.

### B.    The Alleged Oral Agreement

The alleged oral agreement between Arnold and Klein during the 2002 conversation is a different matter. Diomed's complaint clearly referred to that oral promise and alleged that Arnold breached it by disclosing the substance of the conversation to VSI. (See Compl. ¶¶ 134-25). As to this oral agreement, in which Arnold allegedly agreed not to disclose information that Klein revealed during their conversation, Diomed argues that it is "enforceable, either as a self-contained agreement, separate from the NDA, or as a modification of the NDA." (Pls.' Surreply, at 1).[2] In response, defendants point to two clauses in the NDA:

> 10.    This agreement constitutes the entire agreement of the parties with respect to the subject matter thereof, and supercedes all previous proposals, oral and written, and all negotiations, conversations or

---

[2]Although Count IX is labeled only "Breach of the Nondisclosure Agreement," the complaint adequately alleges breach of the oral agreement as well.

>       discussions heretofore had between the parties related to this
>       Agreement....
> 11.   This Agreement will not be deemed or construed to be modified,
>       amended, rescinded, canceled or waived, in whole or in part, other than
>       by written instrument signed by both of the parties hereto.

(Barzilay Decl. Ex. 11, ¶¶ 10-11). Defendants contend that these provisions rendered ineffective any subsequent oral agreement between Klein and Arnold, whether such agreement is viewed as an independent contract or as a modification of the NDA.

Under Minnesota law, which governs the NDA (Barzilay Decl. Ex. 11, ¶ 15), the presence of the merger clause in paragraph 10 is relevant insofar as it indicates that the NDA was a fully integrated agreement. See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 312 (Minn. 2003). Although the parol evidence rule prohibits the admission of prior or contemporaneous oral agreements when such evidence contradicts or varies the terms of a fully integrated agreement, Minnesota courts have repeatedly held that parol evidence is admissible to show subsequent oral modification of a contract. See, e.g., Material Movers, Inc. v. Hill, 316 N.W.2d 13, 17 (Minn. 1982) ("Evidence of subsequent oral agreements is not excluded by the [parol evidence] rule."); Nord v. Herreid, 305 N.W.2d 337, 339-40 & n.1 (Minn. 1981). Thus, the merger clause does not bar Diomed from arguing that a subsequent oral agreement between Arnold and Klein may have modified the NDA. Nor is Diomed barred from raising such a claim by paragraph 11; provisions prohibiting oral modification of a written agreement are not controlling in Minnesota. See Mankato Implement, Inc. v. J.I. Case, No. Civ 4-90-421, 1991 U.S. Dist. Lexis 20082, at *8 (D. Minn. Aug. 29, 1991) ("Nor are oral modifications of an agreement prohibited, even if

the agreement expressly forbids such oral modification."); accord Larson v. Hill's Heating & Refrigeration of Bemidji, Inc., 400 N.W.2d 777, 781 (Minn. Ct. App. 1987).

Defendants are more successful when they attack Diomed's proof. Minnesota courts require that subsequent oral modifications of a written agreement be shown by clear and convincing evidence. See Norwest Bank Minn., N.A. v. Midwestern Machinery Co., 481 N.W.2d 875, 881 (Minn. 1992); Merickel v. Erickson Stores Corp., 95 N.W.2d 303, 306 (Minn. 1959). This standard applies whether the oral agreement is viewed as an oral modification of the NDA, or as an entirely separate agreement at variance with the terms of the NDA. See Norwest Bank Minn., 481 N.W.2d at 881. And because the "substantive evidentiary standard of proof that would apply at trial on the merits" must be taken into account on a summary judgment motion, the relevant inquiry is whether "evidence in the record could support a reasonable jury finding either that the plaintiff has shown [modification] by clear and convincing evidence or that the plaintiff has not." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 255-56 (1986).

The only evidence of an oral agreement offered by Diomed is Klein's deposition testimony, which is hardly clear and convincing. Klein admitted that he and Arnold never discussed the NDA. (Trumbold 2d Decl. Ex. 1, at 133-34). It is unclear how Arnold and Klein could have agreed to vary or depart from the terms of the NDA, without mentioning the agreement. While express agreement is not always required, and while "subsequent acts and conduct . . . may establish implied modification," see Reliable Metal, Inc. v. Shakopee Valley Printing, Inc., 407 N.W.2d 684, 687 (Minn. Ct. App. 1987), Diomed points to no such non-verbal conduct. Nor does Klein provide a

satisfactory explanation as to why he did not discuss the NDA's requirements with Arnold. He testified that he was not aware of the written-confirmation requirement at the time (Trumbold Decl. Ex. D, at 105-06), but that explanation is undermined by his own admission (1) that he was familiar with nondisclosure agreements generally, and the use of written confirmation provisions specifically; and (2) that he had received an email from the chairman of Diomed's board just prior to the execution of the NDA specifically recommending the inclusion of a written-confirmation requirement. (Id. at 107-11).

Thus, even assuming that Klein did raise confidentiality during his conversation with Arnold, his failure to discuss the terms of the NDA, when he was aware of the NDA and should have been aware of its written-confirmation requirement, is hardly clear and convincing evidence of an intent to modify or waive the requirements of the NDA. Because a reasonable jury could not find oral modification of the NDA by clear and convincing evidence, the original terms of the NDA control. Because Diomed concededly failed to confirm in writing the confidential nature of Klein's conversation with Arnold, its claim of breach must fail. Defendants are entitled to summary judgment on Counts IX (breach of the NDA) and VIII (tortious interference with contract).

III.    Misappropriation of Trade Secret (Count I)

The only remaining substantive count is trade secret misappropriation. The alleged trade secret was (1) information concerning the marked sheath, which Diomed planned to introduce as part of its improved System in 2003, and (2) Diomed's marketing strategy for its improved System. The alleged misappropriation was Arnold's

9

disclosure of this information (which she learned through her confidential relationship with Klein) to VSI, and VSI's subsequent use of that information to develop its own laser treatment system for varicose veins.

Although the parties disagree in their papers as to whether Massachusetts or Minnesota trade secret law applies, they conceded at oral argument that "neither party has identified a difference between the two states." (Summ. J. Hearing Tr., at 21). Choice-of-law disputes, which are governed by the rules of the forum state, need only be resolved if an "actual conflict exists." See Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004). Since the parties agree that no conflict exists, I will apply the laws of both states, which are, in fact, substantially similar.[3] To demonstrate misappropriation of trade secrets, Diomed must prove "(1) the information in question is a trade secret, (2) [Diomed] took reasonable steps to preserve the secrecy of that information, and (3) [defendants] used improper means, in breach of a confidential relationship, to acquire and use that trade secret." DB Riley, Inc. v. A.B. Engineering Corp., 977 F. Supp. 84, 89-90 (D. Mass. 1997); accord Jostens, Inc. v. Nat'l Computer Sys., Inc., 318 N.W.2d 691, 701 (Minn. 1982). Defendants contend that Diomed has failed to present a triable issue of fact as to (1) trade secret status, (2) the existence of a confidential relationship, and (3) defendants' use of the alleged trade secret.

    A.    <u>Trade Secret Status</u>

---

[3]Trade secret is governed by statute in Minnesota, see Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983), and by common law in Massachusetts, see Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972).

In both Massachusetts and Minnesota, courts determine trade secret status by examining multiple factors, including whether the owner took reasonable precautions to maintain its secrecy. See Touchpoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 29 (D. Mass. 2004); Electro-Craft, 332 N.W.2d at 898. In defendants' view, Diomed's failure to designate Klein's oral disclosure as confidential under the terms of the NDA means that it did not take enough care to preserve the secrecy of the information, thereby relinquishing trade secret status. While defendants are correct that Diomed's failure to comply with the NDA is relevant to a determination of trade secret status, it is not dispositive, since courts consider other factors as well. See Touchpoint, 345 F. Supp. 2d at 29; Electro-Craft, 332 N.W.2d at 898. Moreover, efforts to preserve secrecy are measured by a standard of "reasonableness, not perfection." Touchpoint, 345 F. Supp. 2d at 30; accord Electro-Craft, 332 N.W.2d at 901. Under this standard, the record contains evidence from which a jury could conclude that Diomed took reasonable precautions to maintain the secrecy of the information allegedly disclosed to Arnold. Klein testified that he did not disclose the information until Arnold confirmed that she would maintain its confidentiality. (Barzilay Decl. Ex. 8, at 104).[4] Moreover, plans for developing the marked sheath were only known to a small number of Diomed employees, and the sales force was, per Diomed's usual policy, kept in the dark until the product was ready for release. (Id. at 200-02). Thus,

---

[4] Although Diomed cited other pages of Klein's deposition transcript, the court was unable to review those pages as Diomed failed to include them in its submissions.

whether or not Diomed took reasonable precautions to preserve the secrecy of the alleged trade secret remains a disputed matter inappropriate for summary judgment.

Defendants also contend that information about the marked sheath was not entitled to trade secret status because it was generally known or readily ascertainable. See Touchpoint, 345 F. Supp. 2d at 27-28; Jostens, Inc., 318 N.W.2d at 698. Specifically, defendants contend (1) that the marked sheath was nothing more than Diomed's existing EVLT sheath, with ruler markings; and (2) that Diomed's patent application, published in December 2002, publicly disclosed the marked sheath design well before VSI launched its Vari-Lase product in July 2003.  I disagree.  First, while secrecy for trade secret purposes is distinguishable from novelty for patent purposes,[5] the patentability of the marked sheath concept—as supported by the notice of allowability issued by the Patent and Trademark Office (McManus Decl. Ex. T)—certainly weighs against a summary judgment finding that the design was readily ascertainable.  Second, while public patent filings do render trade secrets readily ascertainable to the public, see Harvard Apparatus, Inc. v. Cowen, 130 F. Supp. 2d 161, 176 (D. Mass. 2001); Porous Media Corp., 2001 WL 1631332, at *5, Diomed's patent application was not publicly filed until December 2002 (see Barzilay Decl. Ex. 12), three months after Arnold joined VSI and began working on its varicose vein treatment product.  (Pls.' 6/28/05 Mem., at 11-12).  Thus, even though Diomed's patent

---

[5]Indeed, the standards of novelty or invention required for patentability are higher than the standard of secrecy required for trade secret, see Atlantic Wool Combing Co. v. Norfolk Mills, Inc., 357 F.2d 866, 869 (1st Cir. 1966), which supports Diomed's claim that its marked sheath was not generally known or readily ascertainable.

12

application was published six months before VSI launched its product, it was published <u>after</u> the alleged misappropriation began.

Finally, defendants ignore the fact that Diomed's trade secret misappropriation claim was based not only on the marked sheath concept, but also on misappropriation of marketing strategy information (Compl. ¶ 83), which both Massachusetts and Minnesota courts recognize as potential trade secret material, <u>see</u> <u>Campbell Soup Co. v. Giles</u>, 47 F.3d 467, 469 n.4 (1st Cir. 1995); <u>Radisson Hotels Int'l, Inc. v. Westin Hotel Co.</u>, 931 F. Supp. 638, 643 (D. Minn. 1996). Because Diomed has presented evidence from which a reasonable jury could conclude that the marked sheath, and Diomed's plans for launching and marketing the sheath, were not generally known or readily ascertainable, summary judgment on those grounds is inappropriate.

     B.    <u>Confidential Relationship</u>

Defendants assert that Diomed's failure to comply with the NDA is additionally relevant to the existence of a confidential relationship, another necessary element of a misappropriation claim. <u>See</u> <u>Knapp Schenk & Co. Ins. Agency, Inc. v. Lancer Mgmt. Co.</u>, No. Civ. A. 02-12118-DPW, 2004 WL 57086, at *6-7 (D. Mass. 2004); <u>Electro-Craft</u>, 332 N.W.2d at 897. They argue that the NDA defined the scope of the confidential relationship between Arnold, as representative of LP, and Klein, as representative of Diomed. Under this theory, Arnold's duty not to disclose or use Diomed information extended only to material properly designated as confidential under the NDA. In support of this contention, defendants cite an Illinois case, in which the court held that under Illinois law, an express confidentiality agreement defined the

13

entire scope of the parties' duties and precluded a finding of any additional implied duty of confidentiality. See Nilssen v. Motorola, Inc., 963 F. Supp. 664, 679 (N.D. Ill. 1997). Because Illinois, like Minnesota, has adopted the Uniform Trade Secrets Act, id. at 666, defendants contend that the same rule applies in Minnesota.

As an initial matter, it is unclear how the NDA, an agreement between Diomed and LP, could define the scope of VSI's duty not to use confidential information it knew had been obtained by improper means. More importantly, neither Massachusetts nor Minnesota courts define the scope of a confidential relationship by looking exclusively to the parties' express agreements. Instead, Massachusetts courts have recognized that information not protected by an express agreement may still be "confidential for the purposes of the misappropriation claim." Knapp Schenk, 2004 WL 57086, at *7. Thus, "even with a written [confidentiality agreement] in place, the Court may examine the conduct of the parties to determine the scope of their confidential relationship and the reasonableness of their efforts to protect secrecy." Touchpoint, 345 F. Supp. 2d at 30. Minnesota courts have similarly refused to treat confidentiality agreements as defining the entire scope of the parties' duties. See Porous Media Corp. v. Midland Brake, Inc., No. Civ. 98-2510, 2001 WL 1631332, at *4 (D. Minn. 2001) (refusing to automatically grant trade secret status to confidential information under the terms of a confidentiality agreement). Instead, Minnesota courts look at both "express or implied restrictions of non-disclosure or nonuse" Surgidev Corp. v. Eye Tech., Inc., 648 F. Supp. 661, 694 n.16 (D. Minn. 1986), as well as duties imposed by the common law, e.g., Jostens, Inc., 318 N.W.2d at 695, 701 (in addition to express nondisclosure agreements, employees'

duty of confidentiality arose out of common law).  Accordingly, I find that Diomed is entitled to argue that Arnold's duty of confidentiality extended to information beyond the scope of the NDA.

At this stage in the litigation, Diomed has presented sufficient evidence to withstand summary judgment as to whether a duty of confidentiality existed as to Klein's alleged oral disclosures.  Not only has Diomed presented Klein's testimony that Arnold expressly agreed not to disclose the information discussed during their conversation, but, in addition, the alleged disclosure took place in the context of sensitive due diligence conducted pursuant to a proposed acquisition.  "Where the facts demonstrate that a disclosure was made in order to promote a specific relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, the parties will be bound to receive the information in confidence."  Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1988).  The issue of confidentiality as to this particular disclosure thus remains very much in dispute, rendering summary judgment improper.

C.   Use

Finally, defendants contend that Diomed has offered no evidence that they actually misappropriated and used the information about the marked sheath.  Diomed, however, cites Arnold's deposition testimony, in which she stated that she began working for VSI in September 2002, at which time it did not have a varicose vein treatment product, nor did it have any plans to enter that market, nor did its chief executive Howard Root, have more than "minimal" knowledge of the market.  (See Barzilay Decl. Ex. 7, at 105-24).  Indeed, Anthony Jakubowski, a former Diomed

15

employee who was hired by VSI in early 2003, testified that no one at VSI had any experience in varicose vein treatments besides Arnold and himself. (Barzilay Decl. Ex. 9, at 76). Yet within Arnold's first week at VSI she was looking for a manufacturer who could assist VSI with launching a varicose vein treatment product, and she spent her first month at VSI analyzing market information for possible entry. (Barzilay Decl. Ex. 7, at 117-23). Moreover, although VSI had budgeted $381,000 for research and development of a varicose vein treatment product, by year-end 2003, it had spent only $121,000, a discrepancy not displayed by other VSI projects. (Barzilay Decl. Ex. 15, at 5). Nevertheless, VSI was able to launch its Vari-Lase product in less than a year and before Diomed, which had already conducted substantial research in the area and had already established relationships with suppliers and manufacturers, was able to bring its own improved EVLT System to market. A reasonable jury could conclude from this evidence that Arnold and VSI misappropriated information confidentially disclosed to Arnold by Klein. Summary judgment is thus inappropriate.

IV.     Remaining Counts

Diomed has also brought a host of derivative claims.[6] Count X alleges common law unfair competition, a claim properly brought under M.G.L. ch. 93A, § 11, which "provides a cause of action for . . . unfair method of competition . . . [and] has been applied by Massachusetts courts to misappropriation of trade secrets." Prescott v. Morton Int'l, Inc., 769 F. Supp. 404, 407 (D. Mass. 1990). The claim is therefore

---

[6]To the extent that Counts X, XI, and XII sought relief based on trademark infringement or VSI's Assurance of Compatibility, those portions of the claim have been voluntarily dismissed by Diomed.

merged with Count XII, which pleads unfair trade practices under chapter 93A, and Count X is dismissed. Summary judgment is allowed as to Counts XI and XII to the extent that they are based on breach of contract or tortious interference with contract, but denied to the extent they are based on trade secret misappropriation.[7]

V.   Conclusion

Defendants' motion for summary judgment (#44 on the Docket) is denied as to Count I, allowed as to Counts VIII and IX, and denied in part and allowed in part as to Counts XI and XII.  All other counts have been dismissed.


_____              /s/ Rya W. Zobel_____
         DATE                       RYA W. ZOBEL
                                    UNITED STATES DISTRICT JUDGE

---

[7] Only conduct occurring primarily and substantially within Massachusetts is actionable under chapter 93A.  See M.G.L. c. 93A, § 11.  It is unclear at this stage whether the alleged trade secret misappropriation occurred primarily and substantially in Massachusetts.  Although Arnold allegedly learned the disputed information at Diomed's facilities, which are located in Massachusetts, the misappropriation presumably occurred when that information was disclosed to and used by VSI, which is located in Minnesota.  Under the statute, VSI bears the burden of proving that the conduct did not occur primarily and substantially within the Commonwealth.